## FELTEX CORPORATION v. DUTCHESS HAT WORKS.

### UNITED STATES v. SAME.
Customs Appeal Nos. 3640, 3641.

Court of Customs and Patent Appeals.
Feb. 5, 1934.

John R. Rafter, of New York City, for Feltex Corp.

Charles D. Lawrence, Asst. Atty. Gen. (Ralph Folks, Sp. Atty., of New York City, of counsel), for the United States.

Louis W. Stotesbury, of New York City, for Dutchess Hat Works.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

These are appeals from a judgment of the United States Customs Court, holding certain felt hat bodies or hoods, composed of wool felt, wholly or partly manufactured, to be properly dutiable at the rate of 40 cents per pound and 75 per centum ad valorem under the provisions of section 1, par. 1115 (b), of the Tariff Act of 1930 (19 USCA § 1001, par. 1115 (b).

The merchandise was classified and assessed with duty by the collector at the port of New York at the rate of 40 cents per pound and 55 per centum ad valorem under the provisions of said paragraph 1115 (b), pursuant to a proclamation of the President of the United States dated March 16, 1931, purporting to be issued under and by authority of section 336 of said Tariff Act of 1930.

In the Tariff Act of 1930, as approved June 17, 1930, said paragraph 1115 (b), so far as is here pertinent, reads as follows:

"Par. 1115. (b) Bodies, hoods, forms, and shapes, for hats, bonnets, caps, berets, and similar articles, manufactured wholly or in part of wool felt, 40 cents per pound and 75 per centum ad valorem * * *."

In so far as pertinent to the questions here involved, said section 336, supra (19 USCA § 1336), reads as follows:

"Sec. 336. Equalization of costs of production.

"(a) Change of classification or duties. In order to put into force and effect the policy of Congress by this chapter intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

*	*	*	*	*	*	*	*

"(c) Proclamation by the President. The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to equalize such differences in costs of production.

*	*	*	*	*	*	*	*

"(e) Ascertainment of differences in costs of production. In ascertaining under this section the differences in costs of production, the commission shall take into consideration, in so far as it finds it practicable:

"(1) In the case of a domestic article. (A) The cost of production as hereinafter in this section defined; (B) transportation costs and other costs incident to delivery to the principal market or markets of the United States for the article; and (C) other relevant factors that constitute an advantage or disadvantage in competition.

"(2) In the case of a foreign article. (A) The cost of production as hereinafter in this section defined, or, if the commission finds that such cost is not readily ascertainable, the commission may accept as evidence thereof, or as supplemental thereto, the weighted average of the invoice prices or values for a representative period and/or the average wholesale selling price for a representative period (which price shall be that at which the article is freely offered for sale to all purchasers in the principal market or markets of the principal competing country or countries in the ordinary course of trade and in the usual wholesale quantities in such market or markets); (B) transportation costs and other costs incident to delivery to the principal market or markets of the United States for the article; (C) other relevant factors that constitute an advantage or disadvantage in competition, including advantages granted to the foreign producers by a government, person, partnership, corporation, or association in a foreign country.

*	*	*	*	*	*	*	*

"(h) Definitions. For the purpose of this section—

"(1) The term 'domestic article' means an article wholly or in part the growth or product of the United States; and the term 'foreign article' means an article wholly or in part the growth or product of a foreign country.

"(2) The term 'United States' includes the several States and Territories and the District of Columbia.

"(3) The term 'foreign country' means any empire, country, dominion, colony, or protectorate, or any subdivision or subdivisions thereof (other than the United States and its possessions).

324

"(4) The term 'cost of production,' when applied with respect to either a domestic article or a foreign article, includes, for a period which is representative of conditions in production of the article: (A) The price or cost of materials, labor costs, and other direct charges incurred in the production of the article and in the processes or methods employed in its production; (B) the usual general expenses, including charges for depreciation or depletion which are representative of the equipment and property employed in the production of the article and charges for rent or interest which are representative of the cost of obtaining capital or instruments of production; and (C) the cost of containers and coverings of whatever nature, and other costs, charges, and expenses incident to placing the article in condition packed ready for delivery.

\* \* \* \* \* \* \* \*

"(k) Investigations prior to enactment of act. All uncompleted investigations instituted prior to the approval of this Act [June 17, 1930], under the provisions of section 315 of the Tariff Act of 1922 [sections 154 to 159 of this title], including investigations in which the President has not proclaimed changes in classification or in basis of value or increases or decreases in rates of duty, shall be dismissed without prejudice; but the information and evidence secured by the commission in any such investigation may be given due consideration in any investigation instituted under the provisions of this section."

Said proclamation of the President (47 Stat. 2438) reads as follows:

"Decreasing Rates of Duty on Wool-Felt Hats and Bodies Therefor

"By the President of the United States of America

"A PROCLAMATION

"Whereas under and by virtue of section 336 of Title III, Part II, of the act of Congress approved June 17, 1930, entitled 'An act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes,' the United States Tariff Commission has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section with respect to, bodies, hoods, forms, and shapes, for hats, bonnets, caps, berets, and similar articles, manufactured wholly or in part of wool felt,

and hats, bonnets, caps, berets, and similar articles, made wholly or in part therefrom, finished or unfinished, being wholly or in part the growth or product of the United States and of and with respect to like or similar articles wholly or in part the growth or product of the principal competing country;

"Whereas in the course of said investigation a hearing was held, of which reasonable public notice was given and at which parties interested were given reasonable opportunity to be present, to produce evidence, and to be heard;

"Whereas the commission has reported to the President the results of said investigation and its findings with respect to such differences in costs of production;

"Whereas the commission has found it shown by said investigation that the principal competing country is Italy, and that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic articles and the like or similar foreign articles when produced in said principal competing country, and has specified in its report the decreases in the rates of duty expressly fixed by statute found by the commission to be shown by said investigation to be necessary to equalize such differences; and

"Whereas in the judgment of the President such rates of duty are shown by such investigation of the Tariff Commission to be necessary to equalize such differences in costs of production;

"Now, therefore, I, Herbert Hoover, President of the United States of America do hereby approve and proclaim the following rates of duty found to be shown by said investigation to be necessary to equalize such differences in costs of production:

"A decrease in the rates of duty expressly fixed in paragraph 1115 (b) of Title I of said act on bodies, hoods, forms, and shapes, for hats, bonnets, caps, berets, and similar articles, manufactured wholly or in part of wool felt, from 40 cents per pound and 75 per centum ad valorem to 40 cents per pound and 55 per centum ad valorem;

"And a decrease in the rate of duty expressly fixed, in addition thereto, in paragraph 1115 (b) on all the foregoing, if pulled, stamped, blocked, or trimmed (including finished hats, bonnets, caps, berets, and similar articles) (within the limit of total decrease provided for in said act), from 25 cents per article to 12½ cents per article.

"In witness whereof, I have hereunto set

my hand and caused the seal of the United States to be affixed.

"Done at the City of Washington this sixteenth day of March, in the year of our Lord nineteen hundred and thirty-one, and of the Independence of the United States of America the one hundred and fifty-fifth.

"[Seal.]        Herbert Hoover.

"By the President:

"Henry L. Stimson

"Secretary of State."

Appellee filed a protest against the action of the collector in the ascertainment and liquidation of duties as aforesaid, claiming in said protest to be an American manufacturer of merchandise of the same class and kind as that made the subject of the protest, and claiming the right to file said protest under the provisions of section 516 of said Tariff Act of 1930 (19 USCA § 1516). Said section 516, so far as is here pertinent, reads as follows:

"Sec. 516. Appeal or protest by American producers.

\*     \*     \*     \*     \*     \*     \*     \*

"(b) Classification. The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of and the rate of duty, if any, imposed upon designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary of the Treasury setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary decides that the classification of or rate of duty assessed upon the merchandise is not correct, he shall notify the collectors as to the proper classification and rate of duty and shall so inform such manufacturer, producer, or wholesaler, and such rate of duty shall be assessed upon all such merchandise imported or withdrawn from warehouse after thirty days after the date of such notice to the collectors. If the Secretary decides that the classification and rate of duty are correct, he shall so inform such manufacturer, producer, or wholesaler, and shall, under such regulations as he may prescribe, cause publication to be made of his decision, together with notice that the classification of and the rate of duty on all such merchandise imported or withdrawn from warehouse after the expiration of thirty days after such publication will be subject to the decision of the United States Customs Court in the event that a protest is filed under the provisions of this subdivision. If dissatisfied with the decision of the Secretary, such manufacturer, producer, or wholesaler may file with him a notice that he desires to protest the classification or the rate of duty imposed upon the merchandise, and upon receipt of such notice the Secretary shall furnish him with such information as to the entries and consignees of such merchandise, entered after the expiration of thirty days after the publication of the decision of the Secretary, at the port of entry designated by the manufacturer, producer, or wholesaler in his notice of desire to protest, as will enable him to protest the classification of or the rate of duty imposed upon such merchandise when liquidated at such port. The Secretary shall direct the collector at such port to notify such manufacturer, producer, or wholesaler immediately upon the liquidation of the first of such entries to be liquidated. Such manufacturer, producer, or wholesaler may file, within thirty days after the date of such liquidation, with the collector of such port a protest in writing setting forth a description of the merchandise and the classification and the rate of duty he believes proper. Upon the filing of any such protest the collector shall notify the Secretary of the Treasury who shall order the suspension, pending the decision of the United States Customs Court upon such protest, of the liquidation, at all ports, of all unliquidated entries of such merchandise imported or withdrawn from warehouse after the expiration of thirty days after the publication of the Secretary's decision. All entries of such merchandise so imported or withdrawn shall be liquidated, or if already liquidated, shall, if necessary, be reliquidated, in conformity with such decision of the United States Customs Court. If, upon appeal to the Court of Customs and Patent Appeals, the decision of the United States Customs Court is reversed, the classification of the merchandise and the rate of duty imposed thereon shall be in accordance with the decision of the Court of Customs and Patent Appeals, and any necessary reliquidation shall be made. The provisions of this subdivision shall apply only in the case of complaints filed after the effective date of this act [June 18, 1930].

"(c) Hearing and determination. A copy of every appeal and every protest filed by an American manufacturer, producer, or wholesaler under the provisions of this section shall be mailed by the collector to the consignee or his agent within five days after the filing

326

thereof, and such consignee or his agent shall have the right to appear and to be heard as a party in interest before the United States Customs Court. The collector shall transmit the entry and all papers and exhibits accompanying or connected therewith to the United States Customs Court for due assignment and determination of the proper value or of the proper classification and rate of duty. The decision of the United States Customs Court upon any such appeal or protest shall be final and conclusive upon all parties unless an appeal is taken by either party to the Court of Customs and Patent Appeals, as provided in sections 501 and 515 [sections 1501 and 1515] of this chapter."

Said protest filed by appellee claimed that said Presidential proclamation was invalid, and claimed that the involved merchandise was properly dutiable at 40 cents per pound and 75 per centum ad valorem under the provisions of section 1, par. 1115 (b), of the Tariff Act of 1930, as originally enacted.

Upon the trial in the Customs Court no witnesses were called and the only evidence introduced consisted of three exhibits, as follows:

Exhibit 1: A communication, dated December 17, 1931, from the Commissioner of Customs to appellee, together with a copy of a communication of the same date from the Commissioner of Customs to the collector of customs for the port of New York.

Exhibit 2: A communication, dated February 29, 1932, from the assistant collector for the port of New York to appellee.

Exhibit 3: Official Report No. 15 of the United States Tariff Commission, being a report to the President on wool-felt hat bodies and hats, with the proclamation of the President here involved as an appendix thereto.

Each of the judges of the Customs Court, First Division, handed down an opinion. The principal opinion was written by Judge McClelland, and concurring opinions were written by Judges Sullivan and Brown. Judges McClelland and Sullivan concurred in holding the proclamation of the President ultra vires. Judge Brown concurred in the conclusion that appellee's protest should be sustained, but solely upon the ground that section 336, supra, is unconstitutional.

Judges McClelland and Sullivan concurred in the judgment rendered, and Judge Brown concurred "in the result of" the judgment for the reasons stated in his concurring opinion.

After the entry of said judgment, the appellant Feltex Corporation filed a motion for rehearing, raising for the first time, so far as appears from the record, the question of jurisdiction of the Customs Court to entertain the protest filed by appellee. This motion was denied by the Customs Court, T. D. 46124.

The Government and the Feltex Corporation took separate appeals from the judgment entered as aforesaid, and both have assigned as error the denial of the motion of the appellant Feltex Corporation for a rehearing.

The issues before us for determination are as follows:

1. Whether or not the Customs Court had jurisdiction to entertain the protest filed by appellee.

2. If the Customs Court did have such jurisdiction, whether or not said proclamation of the President is valid.

We will first consider the question of the jurisdiction of the Customs Court to entertain appellee's protest.

The Government does not in its printed brief, or upon oral argument before us did it, raise this question, but the appellant Feltex Corporation challenges such jurisdiction upon two grounds:

1. That the protest of appellee is not authorized by any provision of law, and fails to state any reviewable question of law or fact.

2. That said protest was filed without compliance with the preliminary requirements of section 516, supra.

With respect to the first point above stated, we would observe that counsel for the appellant Feltex Corporation has presented a very able argument in support of his position that said section 516, supra, does not authorize a protest by an American manufacturer bringing into question the validity of a Presidential proclamation issued pursuant to the provisions of said section 336.

He contends that the right of protest granted by said section 516 is limited to matters of classification, and does not authorize a protest where no complaint is made with respect to the classification of specific merchandise, but only to the rate of duty imposed thereon; that in the case at bar no contention is made that the classification for duty was not proper, but only that the correct rate of duty was not assessed. In this contention he relies in large part upon the fact that subdivision (b) of said section 516 is

entitled "Classification," that the section authorizes the American manufacturer to file a protest upon compliance with the conditions named, "setting forth a description of the merchandise, *the classification, and the rate or rates of duty he believes proper*" (italics ours), and that the section makes it the duty of the collector to transmit the protest to the Customs Court for determination of the "proper classification and rate of duty." It is further contended that the legislative history of said section 516 (b) supports the construction given thereto by counsel for the appellant Feltex Corporation.

■ It is a master rule of construction of statutes that they shall be so interpreted as to carry out the legislative intent. United States v. Clay Adams, Co., Inc., 20 C. C. P. A. (Customs) 285, T. D. 46078, and cases therein cited.

■ We think it is clear from an examination of the statute itself that Congress intended to authorize an American manufacturer to protest any rate of duty upon imported merchandise similar to that manufactured by him and secure a judicial determination of the legality of the same, upon compliance with the provisions of said section 516 (b), 19 USCA § 1516 (b).

Section 516 (b) while entitled "Classification," recites that "If such manufacturer, producer, or wholesaler believes that the *proper rate of duty* is not being assessed, he may file a complaint with the Secretary of the Treasury * * *. If the Secretary decides that the classification of *or rate of duty* assessed upon the merchandise is not correct, he shall notify the collectors * * *." (Italics ours.) It further provides that "If dissatisfied with the decision of the Secretary, such manufacturer, producer, or wholesaler may file with him a notice that he desires to protest the classification *or the rate of duty* imposed upon the merchandise * * *." (Italics ours.)

We think the foregoing conclusively shows that Congress did not intend that the right of protest of an American manufacturer should be confined to matters of classification, but did intend that such privilege should be extended to protests against rates of duty, irrespective of classification.

Counsel for appellant Feltex Corporation relies upon the legislative history of said section 516 (b) (19 USCA § 1516 (b) to support his contention that Congress did not intend to grant to an American manufacturer the privilege of contesting the legality of any order or finding entering into the fixing of the rate of duty complained of. We have examined said history with care and cannot agree with this contention. On the contrary, without going into a discussion of such history, we are convinced that it shows that Congress did intend that an American manufacturer, upon compliance with the provisions of said section 516 (b), might protest the rate of duty assessed against importations to the same extent, so far as judicial review is concerned, as an importer might do under the provisions of section 514 (19 USCA § 1514), providing for protests by importers against decisions of the collector.

Section 516 (b) of the Tariff Act of 1922 (19 USCA § 401) was the predecessor of said section 516 (b) of the Tariff Act of 1930 (19 USCA § 1516 (b). In so far as is here material, that section was substantially the same as section 516 of the act of 1930, except that in the act of 1922 it was provided that the protest of the American manufacturer might be filed "with the same effect as a protest of a consignee filed under the provisions of sections 514 and 515 [sections 398 and 399] of this title." This provision is omitted in the 1930 act, and counsel for the Feltex Corporation argues therefrom that the right of protest is more limited under the 1930 act than it was under the act of 1922. We cannot agree with this contention. We have examined the reports of the committees of the two Houses of Congress upon the bill which became the Tariff Act of 1930 with care, and find no intimation therein that the privilege of the American manufacturer, with respect to protests, was intended to be any less in scope under the Tariff Act of 1930 than the privilege granted under the Tariff Act of 1922.

Moreover, the language above quoted from section 516 (b) of the act of 1922 was plainly inconsistent with other provisions of that section. Under section 514 of the act of 1922 (19 USCA § 398), the collector, upon the filing of a protest, was required to review his decision and might modify the same in whole or in part, while section 516 of the act of 1922 expressly required the collector to forward a protest filed thereunder to the Board of General Appraisers for determination, without any consideration, upon his part, of the protest. Therefore, by the very terms of section 516 (b) of the act of 1922 (19 USCA § 401), a protest by an American manufacturer could not be filed with "the same effect as a protest of a consignee filed under the provisions of sections 514 and 515 [sections 398 and 399]" of said Tariff Act of 1922. Doubtless this inconsistency was the reason

328

for the omission of this provision from section 516 (b) of the Tariff Act of 1930 (19 USCA § 1516 (b), and it was not for the purpose of placing any greater restriction upon American manufacturers in protests than was contained in section 516 (b) of the Tariff Act of 1922.

■ It is our view that the proceeding before us is primarily a suit against the Government. State of Louisiana v. McAdoo, 234 U. S. 627, 34 S. Ct. 938, 58 L. Ed. 1506. We hold that such suit is expressly authorized by section 516 (b) of the Tariff Act of 1930, and that such authorization includes a case based upon the alleged invalidity of a Presidential proclamation under section 336 of the Tariff Act of 1930 (19 USCA § 1336). We further hold that appellee's protest properly raises the question of the validity of the proclamation herein involved.

■ Counsel for appellant Feltex Corporation further contends that the protest in the case at bar was filed without compliance with the preliminary requirements of section 516 (b), supra. Upon this point we find that the protest avers that all preliminary requirements were complied with, setting out in detail the steps taken by appellee and the Secretary of the Treasury with respect thereto.

The report of the collector, transmitted to the Customs Court with the protest, states: "This protest was lodged by an American manufacturer, producer or wholesaler under the provisions of section 516, act of 1930, and a copy thereof was mailed to the consignee or his agent within five days after the filing."

Exhibit 1, introduced in evidence by appellee and received without objection, consists of two letters from F. X. A. Eble, Commissioner of Customs, one addressed to appellee and the other to the collector of customs at New York. The letter to appellee recites the filing of a complaint by it under the provisions of section 516 of the Tariff Act of 1930 (19 USCA § 1516), and recites the inclosure of a copy of a letter addressed to the collector of customs at New York, approving his practice of assessing duty upon articles of the character of those here involved in accordance with the President's proclamation hereinbefore set forth. Said letter addressed to the collector of customs also recites the receipt of a complaint from appellee, and further states:

"The complainants state that the rate of duty originally prescribed in the Tariff Act

of 1930 should be assessed rather than the rate proclaimed by the President, and that the proclamation of the President, for various reasons set forth in the complaint, is without legal warrant and is unconstitutional.

"In view of the fact that the President, under the provisions of section 336 of the Tariff Act of 1930, has found that the rates of duty expressly fixed in paragraph 1115 (b) of Title I on the merchandise provided for therein were higher than the rates of duty necessary to equalize the differences in costs of production of domestic articles and like or similar foreign articles, and has proclaimed the rates necessary to equalize the same, your practice of applying the rates so proclaimed is hereby approved."

Section 3 (a) of "An Act To create a Bureau of Customs and a Bureau of Prohibition in the Department of the Treasury," approved March 3, 1927, 44 Stat. L. 1381, 1382, 5 USCA § 281b (a), T. D. 44221, provides: "Sec. 3. (a) The Secretary of the Treasury is authorized to confer or impose upon the Commissioner of Customs or any of the officers of the Bureau of Customs any of the rights, privileges, powers or duties, in respect of the importation or entry of merchandise into, or exportation of merchandise from, the United States, vested in or imposed upon the Secretary of the Treasury by the Tariff Act of 1922 [chapter 3 of Title 19] or any other law."

Clearly the duties imposed upon the Secretary of the Treasury under the provisions of section 516 (b), supra, are in respect to the importation of merchandise into the United States, and therefore, by the provision of law last above quoted, the Secretary of the Treasury had the power to confer upon the Commissioner of Customs the right to exercise the powers conferred upon him, the Secretary, with respect to a complaint of an American manufacturer.

Therefore the cases of United States v. Central Vermont Railway Co., 17 C. C. P. A. (Customs) 166, T. D. 43474, and United States v. William Prym of America, Inc., 17 C. C. P. A. (Customs) 180, T. D. 43475, relied upon by counsel for the Feltex Corporation, are not applicable to the case at bar.

Furthermore, we would observe that the communication here being considered was signed by the Commissioner of Customs and approved and signed by the Secretary of the Treasury.

We agree with the Customs Court that it had jurisdiction to entertain the protest of

appellee and to determine the involved issues upon their merits.

We next come to the merits of the controversy before us, viz.: Did the United States Customs Court err in holding said proclamation of the President to be invalid?

This finding of invalidity by the Customs Court is based upon three grounds, two of which are concisely stated in appellee's brief, as follows:

"Point I. The United States Tariff Commission, in making its purported investigation and report to the President under section 336 of the Tariff Act of 1930, acted without and in violation of the statute, in accepting and adopting the foreign invoice value or invoice prices in lieu of and as a substitute for cost of production for the purpose of comparison with the domestic cost of production, as the basis of equalization of costs of production.

"Point II. That the United States Tariff Commission acted without the law in taking the year 1929, a period prior to the enactment of the Tariff Act of 1930, as the period within which to ascertain the alleged differences in costs of production which was to and did form the basis of its report to the President, and that the proclamation of the President founded on the report of the Tariff Commission, is, in consequence thereof, ultra vires, void and of no legal effect."

Appellee, under the heading of point III in its brief, further states: "If the statute does authorize the acceptance of the weighted average of the invoice prices or values, and/or the average wholesale selling price, without deductions, as a substantive figure with which to compare domestic cost of production as the basis of a new tariff tax, the statute so construed becomes an illegal delegation of legislative power to executive officers in violation of the Constitution."

In United States v. Sears, Roebuck & Co., 20 C. C. P. A. (Customs) 295, T. D. 46086, certiorari denied 290 U. S. 633, 54 S. Ct. 51, 78 L. Ed. ——, the constitutionality and construction of section 336, supra, was considered. This decision was rendered by us subsequent to the decision of the lower court in the case at bar. We there held that said section was constitutional and that in its provisions there was no illegal delegation of power to the Tariff Commission or to the President of the United States. We further held, following the decisions in the cases of Foster & Co., Inc., et al. v. United States, 20 C. C. P. A. (Customs) 15, T. D. 45673, and United States v. Fox River Butter Co., 20 C.

C. P. A. (Customs) 38, T. D. 45675, that if the President went beyond or contrary to, or did not observe, the limitations and conditions of said section 336 of the Tariff Act of 1930 (19 USCA § 1336), the legality of his order and proclamation might be reviewed by us upon appeal. It of course follows that it may also be reviewed by the Customs Court.

We will consider the first claim of appellee, sustained by the Customs Court, that the United States Tariff Commission acted in violation of the statute in accepting the weighted average of invoice prices in lieu of, and as a substitute for, cost of production. This claim is based upon the report of the Tariff Commission to the President, together with the "Summary of Information" accompanying said report.

With respect to this claim of appellee, sustained by the Customs Court, that the United States Tariff Commission accepted the weighted average of invoice prices in lieu of, and as a substitute for, cost of production, we hold that, for the reasons hereinafter stated, whether the Commission did so accept them is immaterial, so far as the question of the validity of said proclamation is concerned.

If section 336 required, as a precedent to his issuing a proclamation approving the rates of duty specified by the Commission, that the President also approve all the findings and conclusions of the Commission with respect to such rates, we should be compelled to consider the finding of the Customs Court set out in point I hereinbefore quoted, but we do not so interpret section 336. Section 336 (a) (19 USCA § 1336 (a) provides that the Commission shall report to the President "the *results* of the investigation and its *findings* with respect to such differences in costs of production." (Italics ours.)

Section 336 (c), 19 USCA § 1336 (c), provides: "(c) Proclamation by the President. The President shall by proclamation approve the rates of duty and changes in classification and in basis of value specified in any report of the commission under this section, if in his judgment such rates of duty and changes are shown *by such investigation of the commission* to be necessary to equalize such differences in costs of production.'" (Italics ours.)

It will be observed that the Commission is required only to report to the President "the results of the investigation," and "its findings," and shall specify in its report such increases or decreases in rates of duty, including any changes in classification, as it

finds shown by the investigation to be necessary to equalize differences in costs of production. It is not required to include in its report the evidence taken, nor is it required to include in its report any statement of the evidence or facts before the Commission, secured in its investigation.

By section 336 (c) the President is not in any way bound by the "results" or "findings" reported by the Tariff Commission. He is required to approve the rates specified by it if, in his judgment, such rates are "shown by such investigation" to be necessary to equalize such differences in costs of production. In forming his judgment, as aforesaid, he is not limited to an examination of the report of the Commission. There is nothing in the statute which expressly or impliedly so requires. One of the principal distinctions between section 336 of the Tariff Act of 1930 (19 USCA § 1336) and section 315 (a–c) of the Tariff Act of 1922 (19 USCA §§ 154–156) is that under said section 315 the President could make any investigation that he saw fit, and might specify any increases or decreases in rates that in his judgment were necessary to equalize costs of production, subject to the limitation that such increases or decreases must not exceed 50 per centum of the rates specified under subtitle 1 of the Tariff Act of 1922. Before he could so act, however, the Tariff Commission must have made an investigation of the differences in costs of production of the merchandise the subject-matter of the President's proclamation.

Under the provisions of section 336 of the Tariff Act of 1930 (19 USCA § 336), the President, in forming his judgment, is confined to a consideration of the facts secured by the Tariff Commission in its investigation, and is further limited to approval of the rates specified by the Commission if he finds, from such investigation, that the rates so specified are necessary to equalize costs of production.

We can find nothing in the statute which limits the President to a consideration of the report of the Tariff Commission, but we think the fair construction of section 336 is that the President, upon a report coming to him from the Tariff Commission, may require such Commission to place before him all the facts secured by it in its investigation, and from such facts the President may determine whether the rates specified in the report of the Commission should be approved.

If the Commission should, in a given case, report only its conclusions, it is clear that the President, if he is confined to the report

of the Commission in arriving at his judgment, would have no facts whatever upon which to base his judgment, but only conclusions of the Commission. It is our opinion that it was the intention of Congress that the President should consider all the relevant facts before the Commission in its investigation in arriving at his judgment, and that, in arriving at such judgment, he is not confined to a consideration of the report of the Commission other than that he must approve or disapprove the rates specified by the Commission in its report.

This brings us to a consideration of the question of whether the record discloses that there were no facts ascertained by the Commission in its investigation that would warrant the Presidential proclamation herein involved.

The report of the Commission shows on its face that it must have had before it many facts not included in the report. It reported that the cost of production in Italy, as defined by section 336 (h), could not be readily ascertained, but reported no facts upon which such conclusion was based. For aught that appears, it may have had many facts before it bearing upon the subject, but not sufficient upon which to make a finding of cost of production as thus defined. It may have had facts relating to profits and losses of manufacturers in Italy which would be relevant in considering the evidence of weighted average of invoice prices bearing upon the cost of production in Italy of the merchandise here involved. The Commission in its report does not purport to state all the facts secured by it in its investigation.

We think it immaterial, so far as the question of the validity of said proclamation is concerned, what report the Commission may have made as to the *results* of its investigation or what *findings* it may have made, other than its finding that the rates specified by it were necessary to equalize the differences in costs of production of the merchandise under investigation. If the President, upon an examination of all the facts before the Commission, had any legal basis for a finding that such rates were necessary to equalize costs of production, his proclamation is valid.

The record before us does not establish that the President accepted and adopted the foreign invoice value or invoice prices in lieu of, and as a substitute for, cost of production as defined in section 336 (h), 19 USCA § 1336 (h), and whether or not the Commission did so, we hold, for the reasons above stated, is immaterial in considering the validity of the proclamation of the President.

The record does not show that there were not facts before the Commission upon which he might properly make the proclamation here in question.

With respect to appellee's second point, that the Tariff Commission acted without the law in taking the year 1929 as the period within which to ascertain the alleged differences in costs of production in Italy and in the United States, a somewhat different question is presented.

Upon this point we think the report of the Commission shows that it had no facts before it upon which differences of costs of production could be found if it was improper to consider the year 1929 as a representative period for the consideration of weighted average of invoice prices.

We are clear, however, that such period was proper for the Commission and the President to consider in determining the cost of production in Italy of the merchandise involved. The investigation here under consideration was instituted by the Tariff Commission pursuant to a resolution of the United States Senate, dated July 3, 1930, sixteen days after the enactment of the Tariff Act of 1930. The Tariff Commission began its investigation in compliance with said resolution on July 11, 1930, eight days after the passage of said resolution by the Senate. Section 336, supra, provides that the Tariff Commission shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article upon request of the President, upon resolution of either or both Houses of Congress, or upon its own motion, or, under certain circumstances, upon complaint of an interested party. Cost of production, as defined in section 336 (h) (19 USCA § 1336 (h), includes the various factors therein specified "for a period which is representative of conditions in production of the article." Section 336 (e) (19 USCA § 1336 (e) provides that in ascertaining the differences in cost of production the Commission shall take into consideration, in so far as it finds it practicable, in the case of a foreign article: "The cost of production as hereinafter in this section defined, or, if the commission finds that such cost is not readily ascertainable, the commission may accept as evidence thereof, or as supplemental thereto, the weighted average of the invoice prices or values for a representative period * * *."

It is clear that Congress, in using the term "representative period," had in mind that conditions upon a given day or during a given month might not fairly reflect the prices at which the merchandise was imported into the United States, but in order fairly to determine invoice prices as evidence of costs of production, they should be considered over a representative period, and their weighted average over such period might be accepted.

In the opinion of Judge McClelland it is stated: "There is nowhere found in the administrative provisions of the Tariff Act of 1930 any language which indicates that any of the provisions of that act were intended by the Congress to be retroactive in effect. The rule is well settled by a long line of authorities that statutes are directed to the future and may only be held to be retroactive when the legislative intent that they are so designed to be is clearly manifested by the legislative body enacting them. See Brown & Co. et al. v. United States, 12 Cust. App. 93, T. D. 40026, and cases therein cited."

We are unable to see wherein these observations are applicable to the case at bar. The proclamation of the President relates only to the future, and there is nothing in the report of the Tariff Commission to indicate that its findings or recommendations should be retroactive in effect.

The statute expressly requires the Commission, in certain circumstances, to select a representative period for the ascertainment of certain facts. This the Commission declares it has done. Moreover, there is no evidence in the record that it was not in fact a representative period for the ascertainment of the weighted average of invoice prices as required by the statute.

We hold that neither the Commission nor the President, in accepting the year 1929 as a representative period as aforesaid, acted in a manner not authorized by the statute, but, on the contrary, acted clearly within the statutory provisions, and the Customs Court erred in holding that the proclamation of the President was ultra vires and void upon the ground that the year 1929 was improperly taken as a representative period for the purposes aforesaid.

With reference to the third point raised by appellee, as hereinbefore set out, inasmuch as we hold that the record does not show that the President accepted the weighted average of invoice prices or values and/or the average wholesale selling price as a substantive figure with which to compare domestic costs of production, it is unnecessary further to discuss this point.

The Customs Court also found, as we understand it, as a third ground of invalidity of the President's proclamation, that the im-

ported merchandise upon which the Tariff Commission ascertained the weighted average of invoice prices for the period of 1929 was not similar to the domestic product. We find nothing in the record to support this finding of the Customs Court.

In conclusion, we hold that, for the reasons stated herein, said proclamation of the President is valid, and that by reason thereof the collector properly assessed the rates of duty here involved.

The judgment of the United States Customs Court is reversed.