26 C.C.P.A.(Customs)
### DAVID L. MOSS CO., Inc., v. UNITED STATES.

**Customs Appeal No. 4114.**

Court of Customs and Patent Appeals.
March 27, 1939.

Barnes, Richardson & Colburn, of New York City (Albert MacC. Barnes, Joseph Schwartz, and J. Bradley Colburn, all of New York City, of counsel), for appellant.

Webster J. Oliver, Asst. Atty. Gen. (Charles D. Lawrence, Sp. Asst. to Atty. Gen., and Joseph F. Donohue, Sp. Attorney, of Nutley, N. J., of counsel), for the United States.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, and LENROOT, Associate Judges, and PARKER, Judge of United States Circuit Court of Appeals for Fourth Circuit.

PARKER, Judge.[1]

This is an appeal by the importer from a judgment of the United States Customs Court, Third Division, overruling a protest by the appellant against the liquidation and assessment of duty made by the collector of customs at New York on an importation of dried egg albumen. The Tariff Act of 1930, paragraph 713, § 1, 19 U.S.C.A. § 1001, par. 713, imposed a duty of 18 cents per pound upon "dried whole eggs, dried egg yolk, and dried egg albumen." Pursuant to Senate Resolution the Tariff Commission held a hearing under section 336 of that act, 19 U.S.C.A. § 1336, and made a report to the Presi-

---

[1] JACKSON, Associate Judge, having declined to participate in this case because of his connection with same as Assistant Attorney General of the United States, Judge JOHN J. PARKER, Senior United States Circuit Judge of the Fourth Judicial Circuit, was designated to serve herein pursuant to the provisions of Title 28, U.S.C., § 301, 28 U.S.C.A. § 301, section 188, Judicial Code.

dent, finding that the duty fixed by the statute on these dried egg products did not equalize the differences in costs of production of the domestic articles and of the like or similar foreign articles produced in the principal competing country, and that the differences in cost were such as to warrant an increase in the duty by the maximum amount permitted by law, viz, 9 cents per pound. Acting upon this report, the President issued a proclamation (T.D. 44997) increasing the duty to 27 cents. The appellant complains of this increase of duty insofar as it applies to dried egg albumen, contending that the Commission's report to the President, as well as the evidence taken before it, show that there was no domestic production of dried egg albumen upon which a finding of cost of production of the domestic article could be predicated, and that consequently the action of the Commission and the proclamation of the President, in so far as they affected the duty on this product, were without legal basis and therefore void.

In the lower court, the evidence taken before the Commission was introduced and, although regarded by that court as immaterial, it was made a part of the record in the case and is before us. The court denied relief to appellant on the ground that it was without legal authority to review the findings of the Tariff Commission or the action of the President based thereon. Two questions, as we view the case, are presented by the appeal: (1) whether the court could look behind the action of the Tariff Commission and the President in increasing duties under section 336 of the act for the purpose of determining whether such action was supported by evidence before the Commission; and (2) if so, whether the increase of duties here complained of was so supported. We think that both of these questions must be answered in the affirmative.

▮▮▮ It is true, as pointed out by counsel for the Government, that the Customs Court is given no direct right of review over action of the Tariff Commission. This does not mean, however, that it is without power to consider the legality of increase of duties resulting from the Commission's action. The court is a court of law, and it is granted full power to relieve against illegality in the assessment or collection of duties. 19 U.S.C.A. §§ 1515, 1518. If relief may not be had before it

against illegal action under the flexible tariff provisions, relief may not be had anywhere; for its jurisdiction in such matters is exclusive. It is the tribunal established by Congress in the provision of a complete system of corrective justice for the administration of the customs laws, and questions involving the validity of official action in the imposition and collection of duties are properly cognizable before it to the exclusion of other courts. Cottman Co. v. Dailey, 4 Cir., 94 F.2d 85, 88; Riccomini v. United States, 9 Cir., 69 F.2d 480, 484; Gulbenkian v. United States, 2 Cir., 186 F. 133, 135; Nicholl v. United States, 7 Wall. 122, 130, 19 L.Ed. 125. There can be no question but that courts must exercise the judicial power vested in them to determine the legal validity of administrative action, where the validity of such action is involved in questions properly before them, whether they have been granted the right of review over action of the administrative agency or not. The duty necessarily arises because of their obligation to decide cases before them according to law. See Shields v. Utah Idaho Cent. R. R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. ——, Crowell v. Benson, 285 U.S. 22, 58, 59, 52 S.Ct. 285, 76 L.Ed 598; United States v. Passavant, 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644; St. Louis Smelting & Ref. Co. v. Kemp, 104 U.S. 636, 641, 26 L.Ed. 875; United States v. Haviland & Co., 2 Cir., 177 F. 175.

Where the question as to the validity of administrative action under the flexible tariff provisions relates to procedural matters, such as the holding of a hearing or the giving of proper notice thereof, the decisions of this court are clear to the effect that it has the power to consider whether the action of the administrative officer was within the power granted by Congress. Thus in the case of Carl Zeiss, Inc. v. United States, 76 F.2d 412, 416, 23 C.C.P.A., Customs, 7, T.D. 47654, where the point involved was the giving of notice of investigation by the Tariff Commission, the court, speaking through Judge Hatfield, said:

"The President, although not required by the provisions of section 336, supra, to accept the results or findings reported by the Tariff Commission, is required to limit his consideration of the case to the evidence presented to that body, and to approve the rates of duty and changes in basis of value specified by it, 'if in his

judgment such rates * * '* [and changes in basis of value] are shown by such investigation * * * to be necessary to equalize such differences in costs of production.' Feltex Corp. v. Dutchess Hat Works, 71 F.2d 322, 323, 21 C.C.P.A. (Customs) 463, T.D. 46957.

"For the purposes of the provisions of section 336, supra, the President of the United States is the agent of the Congress, and he may not act under those provisions until a legal investigation has been made by the Tariff Commission. One of the prerequisites of such an investigation is the giving of "reasonable public notice" thereof to all interested parties, in order that they may, if they so desire, be present, produce evidence, and be heard. * *

\* \* \* \* \* \*

"For the reasons stated, we must hold that `the proclamation of the President was without authority of law, illegal, and void * * *.*"

And in Akawo & Co. v. United States, 77 F.2d 660, at page 663, 23 C.C.P.A., Customs, 75, at page 79, T.D. 47737, decided under the flexible provision of the 1922 act, the rule is stated by the court, as follows: "That a legal investigation by the Tariff Commission is a condition precedent to a lawful proclamation by the President, under the provisions of section 315(a), (b), and (c), supra, has been repeatedly held by this court. [Citing cases.]"

█ And there is no reason why the same rule should not be applied where the question of jurisdiction arises upon a contention that the action of the Commission and the President was contrary to law because without substantial support in the evidence adduced upon the investigation. The act contemplates, not merely that the Commission shall conduct an investigation with notice and hearing, but also that it shall base its findings and recommendations embodied in its report on what is shown by the investigation, and that the President in forming his judgment shall be confined to what is so shown. As said by Judge Lenroot, speaking for this court in Feltex Corp. v. Dutchess Hat Works, 71 F.2d 322, 330, 21 C.C.P.A., Customs, 463, T.D. 46957:

"Under the provisions of section 336 of the Tariff Act of 1930 * * * the President, in forming his judgment, is confined to a consideration of the facts secured by the Tariff Commission in its investigation, and is further limited to approval of the rates specified by the Commission if he finds, from such investigation, that the rates so specified are necessary to equalize costs of production.

"We can find nothing in the statute which limits the President to a consideration of the report of the Tariff Commission, but we think the fair construction of section 336 is that the President, upon a report coming to him from the Tariff Commission, may require such Commission to place before him all the facts secured by it in its investigation, and from such facts the President may determine whether the rates specified in the report of the Commission should be approved."

█ It is clear, therefore, that an investigation must be conducted and a hearing had by the Commission as a basis for action under the act; and, if such evidence is not taken, action is not authorized. St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L.Ed. 1033: When the question is properly raised, the courts must determine whether this prerequisite to action has been complied with; and compliance is not shown by a mere showing that an investigation has been conducted and a report made. Of course, under the maxim omnia præsumuntur rite esse acta, the proclamation of the President makes a prima facie showing of authority; but if it is established before the court that there was no substantial evidence before the Commission upon which action complained of could have been based, such action must be held void because not within the authority granted by Congress. It is settled that, where an order of a commission can be made only after hearing, it is void if unsupported by the evidence. Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 68 L.Ed. 667. A finding without evidence is beyond the Commission's power. United States v. Abilene & Sou. Ry. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016.

█ This does not mean that the court may review the facts or substitute its judgment for that of the Commission. It means merely that, where the question is properly raised, it must determine whether the Commission acted within the scope of the authority granted it by Congress and that, in determining this question, it

must consider whether the Commission had before it any substantial evidence upon which to base its action. The precise question was involved in the case of Shields v. Utah Idaho Cent. R. R. Co., supra, where action of the Interstate Commerce Commission, for which no review had been provided, had been challenged before the court. The Supreme Court, after remarking that the question on judicial review would "simply be whether the Commission had acted within its authority," went on to say (305 U.S. 177, 59 S.Ct. page 165, 83 L.Ed. ——): "The condition which Congress imposed was that the Commission should make its determination after hearing. There is no question that the Commission did give a hearing. Respondent appeared and the evidence which it offered was received and considered. The sole remaining question would be whether the Commission in arriving at its determination departed from the applicable rules of law *and whether its finding had a basis in substantial evidence or was arbitrary and capricious. Id.* That question must be determined upon the evidence produced before the Commission." [Italics supplied.]

Attempt is made to distinguish the Shields case on the ground that the court before which the question was raised in that case was a court of equity, but that case was cognizable in equity because no adequate remedy at law had been provided. Here the remedy provided by law, as heretofore shown, is complete and exclusive; and the duty devolves upon the court to decide the questions of law raised by the record. Whether the Commission and the President acted upon substantial evidence in increasing the duty, and therefore within the authority granted them, is such a question of law.

Union Fork & Hoe Co. v. United States, 86 F.2d 423, 24 C.C.P.A., Customs, 199, T.D. 48656, is not to the contrary. What was there decided was that the court could not examine the evidence before the Commission for the purpose of reviewing its findings and conclusions, not that it could not look to the evidence to ascertain whether the action complained of had substantial support therein so as to be within the authority granted the Commission. Nor is there support for a contrary position in Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796. The decision in that case was that the provision for a hearing before the Commission did not give a right to the inspection of matter furnished it as confidential information. The case arose under the flexible provisions of the 1922 act; and much was said in the course of the opinion that has no application to proceedings under the 1930 act, which, as heretofore pointed out, limits the President in the exercise of his judgment to a consideration of the facts developed before the Commission in the course of its investigation.

■ We come then to the second question, which is whether there was substantial evidence before the Commission to sustain its findings upon which the increase of duties was based. Much has been said as to what we can consider in deciding this question; but we think it clear that the answer is inherent in the nature of the question itself. We can and must consider the evidence before the Commission, and not merely its report; for if the evidence before it justifies its findings and the action of the President thereon, that action cannot be set aside because of what the Commission may or may not have said in its report by way of summary or otherwise. As said by this court in Feltex Corp. v. Dutchess Hat Works, supra: "We think it immaterial, so far as the question of the validity of said proclamation is concerned, what report the Commission may have made as to the results of its investigation or what findings it may have made, other than its finding that the rates specified by it were necessary to equalize the differences in costs of production of the merchandise under investigation. If the President, upon an examination of all the facts before the Commission, had any legal basis for a finding that such rates were necessary to equalize costs of production, his proclamation is valid."

Questions have been raised as to difficulties which may be presented with respect to confidential information furnished the Commission in the course of its investigation; but no such question is presented here, for there appears to have been no confidential information furnished with respect to the matter here involved and the entire evidence before the Commission relative thereto is before us.

■ The contention of appellant is that there was no substantial evidence be-

fore the Commission that dried egg albumen was a "domestic article" within the meaning of section 336 of the act and consequently that an increase of duties on this article was not authorized. This contention must be considered in the light of the purposes of the act and the classifications made by it. The clear purpose of paragraph 713, § 1, was. to protect the egg producing industry. It levied a duty of 10 cents per dozen on eggs in the shell, 11 cents per pound upon frozen egg products and 18 cents per pound upon dried egg products. It will be noted that dried whole eggs, dried egg yolk, and dried egg albumen are classified together for the imposition of the last-named duty. Effort was made to have Congress fix the duty on the dried egg products at a higher rate because necessary to the protection of the egg producing industry. This was not done, but a resolution was passed by the Senate directing that an inquiry be conducted by the Tariff Commission with reference to the matter. The inquiry related to all of the dried egg products which had been classified together by Congress for the imposition of the duty.

The evidence before the Commission disclosed that the egg drying industry in the United States had been in very large measure stifled by the competition of dried egg products imported from China; but it showed also that, but for this competition, the industry would be carried on here. The production of eggs in the shell in the United States was shown to be an average of 2,159,000,000 dozen over the three-year period 1928–30, a demand for dried egg products which shell eggs and frozen egg products could not supply was shown, and milk drying machinery which could and would have been used for drying eggs if the industry had been adequately protected against the cheap foreign product was shown to have been located at various sections of the country. In addition to this, there was evidence that the drying of eggs had been carried on in the United States at a number of places. A creamery in Spokane, Wash., was shown to have engaged in making egg powder from dried eggs during the years 1928, 1929, and 1930, operating three months during the year and making an average of 70,000 pounds of powder annually. This company dried whole eggs and yolks. It did not dry albumen, according to the testimony, because unable to compete in price with the cheap foreign product. An egg dealer in Kansas City dried 2,000,000 pounds of liquid eggs in the year .1927. In 1928 he was unable to operate on account of the competition of the Chinese product. In 1929 he operated for ten days and then ceased operation because of that competition. In 1930 he operated for six weeks and in 1931 about two or three weeks. This dealer used a drying machine of the same type as those used in China with a daily capacity of 15,000 pounds of liquid. The Kraft-Phoenix Cheese Corporation was shown to have engaged in egg drying at its Denison, Tex., plant for four or five years prior to the hearing before the Commission in 1931 and to have developed machinery for that purpose. At the time of the hearing its drying operation on whole eggs was approximately 6,000 pounds per day. It had dried 30,000 pounds of yolk and had experimentally dried 6,000 to 7,000 pounds of the white or albumen.

The vice president of the Emulsol Corporation of Chicago, Albert Epstein, testified that his company packs frozen egg products, and that in 1929 it entered into the egg drying business, "especially drying whites"; that during the year 1929 it had approximately three million pounds of liquid yolk material frozen, as a result of which it had on hand a large amount of whites or egg albumen; that, in order to save extra storage and transportation charges, it, by its chemists, made a study of the feasibility of drying egg albumen; that the conclusion was reached that the process was not difficult, that the Chinese egg albumen was "not up to the high quality and standard of other similar food products which the American food manufacturer is using as a raw material," and that it was believed that, by the application of the technical skill of its chemists, a dried egg albumen could be produced which would be superior to the Chinese product; that a plant was installed for that purpose, and 100,000 pounds of liquid whites were dried and about 10,000 pounds of dried egg albumen were produced and sold by said company. The witness further testified as follows:

"The reason we were compelled to give up this venture, although we have invested, according to our books, about $7,080 in equipment—just cost of equipment, without figuring our time and labor and engineering facilities for installing same —because we could not compete with the

dried Chinese egg albumen, although our quality was much superior in every respect.

"I have here samples of the products. I do not even know what lot it is, whether the first lot, the second lot, or the third lot, because we practically sold everything and had just a few samples laying around. But I will be very glad to submit them for your inspection."

Some of the dried egg albumen produced as stated was offered in evidence.

 In the light of this evidence, we cannot say that there was no evidence of production of a domestic article upon which the Commission could base its findings in recommending an increase of duty on dried egg products. It is true that there was very little evidence as to production of dried egg albumen, and most of this was as to production of an experimental character. The feasibility of production was clearly established, however, and production costs were ascertained; and production did not go forward merely because of the blighting effect of the cheap Chinese product. Some production even of dried albumen was shown during the period in question; and we do not think we would be justified in saying that there was no evidence of the production of a domestic article upon which the Commission could base its finding as to the cost of production.

We may assume, without deciding, that it was the intention of Congress that duties should be raised under the flexible provisions of the tariff act only in cases where a domestic industry was in existence which Congress desired to protect, and that it was not intended that the Commission should increase duties in an attempt to bring new industries into existence. And we may assume, also without deciding, that sporadic or experimental production would not satisfy the test of an existing domestic industry under this rule. But what we have here is not a case of that sort. As heretofore stated, the industry which Congress was seeking to protect was the egg producing industry, a well-established domestic industry existing on a nation-wide scale. It was necessary for its protection to impose duties upon dried egg products as well as upon eggs in the shell, as the drying of eggs in foreign countries to be sold here destroyed a large domestic demand which would exist for eggs for drying purposes. The drying, whether of whole eggs, yolks or albumen, was but a process of preparing the eggs for market, and it was a process the cost of which was readily ascertainable and, considered in connection with the cost of domestic eggs, clearly established the cost of production of the domestic article. As stated, there was enough domestic drying to enable the Commission to compute this cost on the basis of actual facts and not theory; and it appeared that the only reason why there was not a greater volume of domestic drying was because of the low price of the foreign product due to the low price of Chinese eggs and the low wages paid Chinese labor. Under such circumstances, there was no reason, we think, why the Commission should not find the difference between the cost of production of the domestic and foreign processed article and make recommendation for increase in duty in protection of an industry which it was clearly the purpose of the act to protect.

We are not impressed with the argument that the increase in duty might be sustained with respect to dried whole eggs and yolks but held invalid as to the dried albumen. Apart from the fact that there was sufficient evidence even as to dried albumen to show the cost of producing the domestic article, it is to be noted that dried albumen was classified by Congress with the other dried egg products in imposing the duty; and there was certainly no basis in the evidence for the Commission to disturb this classification in recommending an increase of duty on these products. On the contrary, the evidence clearly showed that the classification was proper and that the duty should be raised upon albumen as well as upon the other dried egg products if these were to be afforded the protection of the increased duties.

Our conclusion is that we have the power to consider the evidence before the Commission for the purpose of determining whether the increase of duties was based upon substantial evidence, and, therefore, within the authority delegated by Congress; but that, when the evidence before the Commission is considered, it is found to support the findings of the Commission and the action taken by the President thereon.

The judgment appealed from will be affirmed.

LENROOT, Associate Judge, concurs in the foregoing opinion.

HATFIELD, Associate Judge (specially concurring).

Section 336 of the Tariff Act of 1930, 19 U.S.C.A. § 1336, providing for investigations and findings by the Tariff Commission and findings and proclamations by the President, was enacted for the purpose of carrying out a legislative policy *relating to an exclusively legislative function*—that of increasing or decreasing within prescribed limits the rates of duty to be assessed upon articles thereafter imported into the United States. Hearings provided for in that section form a part only of an investigation, as the statute does not provide, either expressly or by necessary implication, that all of the evidence presented for the consideration of the Commission and the President shall be submitted at the hearings. Evidence of a confidential nature shall be so considered. See section 335 of that act, 19 U.S.C.A. § 1335. Such evidence may be much or little, and the findings of the Commission and the President may be based upon it. The Congress certainly did not intend that such evidence should be open to inspection in a judicial proceeding.

The hearings provided for in the statute under consideration are of the same character as those provided for in section 315 (c) of the Tariff Act of 1922, 42 Stat. 941. Accordingly, they may be either private or public, and clearly are not judicial in character. Norwegian Nitrogen Co. v. United States, 288 U.S. 294, 317, 53 S.Ct. 350, 77 L.Ed. 796.

I am unable to find anything in the provisions of section 336, supra, to indicate that the Congress intended to provide for judicial review of the *findings* of either the Tariff Commission or the President, and I think it is apparent from the evident purpose of the enacted legislation that the Congress did not so intend.

The views of the majority of my associates, as I understand them, are that, although the *hearings* are not judicial in character because they are a part only of the investigation, the *investigation* is a judicial proceeding because, in determining whether he shall approve or disapprove the rates of duty specified in the report of the Commission, the President is confined to a consideration of the evidence secured by the Commission in the course of its investigation. If legal rights were affected by the findings of the President, I would have no difficulty in accepting those views.

The following cases are representative of one line of decisions relied upon by the majority: Chicago Junction Case, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667; United States v. Abilene & Southern Railway Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016; Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Shields v. Utah Idaho Central R. R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. ——.

In the St. Joseph Stock Yards Co. case, supra, it was held that an order of the Secretary of Agriculture fixing stockyard rates was subject to judicial review upon the law and the facts, because it affected legal rights of which the company could not be deprived without due process of law.

The case of Crowell v. Benson, supra, involved the Longshoremen's and Harbor Workers' Compensation Act (44 Stat. 1424; U.S.C., title 33, §§ 901–950, 33 U.S.C.A. §§ 901–950). The act reserved to the admiralty courts full power to pass upon questions of law, and it was held that the statute satisfied the due process clause of the Fifth Amendment, U.S.C.A.Const.

In the case of Shields v. Utah Idaho Central R. R. Co. case, supra, the Supreme Court held that under the Railway Labor Act (48 Stat. 1185; 45 U.S.C. § 151, 45 U.S.C.A. § 151) the "hearing" before the Interstate Commerce Commission provided for in the act had "obvious reference 'to the tradition of judicial proceedings in which evidence is received and weighed by the trier of the facts.' The 'hearing' is 'the hearing of evidence and argument.' Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288. *And the manifest purpose in requiring a hearing is to comply with the requirements of due process upon which the parties affected by the determination of an administrative body are entitled to insist.* [Italics supplied.] Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 227 U.S. 88, 91, 33 S.Ct. 185, 186, 57 L.Ed. 431." Similar views were expressed by the Supreme Court in the Chicago Junction Case, supra, and in the case of United

States v. Abilene & Southern Railway Co., supra.

It may be said, therefore, that judicial review may be had of all orders of administrative officials where the statute so provides. If the statute does not so provide, and if legal rights are affected, the due process clause of the Fifth Amendment is authority for such review.

No legal rights were affected either by the findings of the Commission or by the Presidential proclamation as "No one has a legal right to the maintenance of an existing rate or duty." Norwegian Nitrogen Co. v. United States, supra [288 U.S. 294, 53 S.Ct. 359]. Although the decision in that case involved the provisions of section 315 of the Tariff Act of 1922 which did not limit the President to a consideration of the evidence obtained by the Commission, the statement by the court in that case that "Neither the action of Congress in fixing a new tariff nor that of the President in exercising his delegated power is *subject to impeachment if the prescribed forms of legislation have been regularly observed*" (as they admittedly were in the instant case), is, in my opinion, clearly applicable to the issues here involved. [Italics not quoted.]

The following cases are representative of another line of decisions relied upon by a majority of the court: United States v. Passavant, 169 U.S. 16, 18 S.Ct. 219, 42 L.Ed. 644; Maddaus v. United States, 3 Ct.Cust.App. 330, T.D. 32623.

Prior to the enactment of the Tariff Act of 1922, decisions of the Board of General Appraisers (now United States Customs Court) as to the *foreign-market value of imported merchandise were* by legislation made final and conclusive. However, the Supreme Court held in many decisions, of which the decision in the Passavant case, supra, is typical, that appraisement decisions were open to collateral attack where the appraising officials had proceeded upon a wrong principle contrary to law or had transcended the powers conferred by statute. The decisions reviewed by the Supreme Court in those cases were obviously not legislative, but judicial, or, at least, quasi judicial in character.

The claimed authority for the protest in the instant case is section 514 of the Tariff Act of 1930, 19 U.S.C.A. § 1514. Under that section protests may be filed against "all decisions of the collector, including the legality of all orders and findings entering into the same, as to the rate and amount of duties chargeable, and as to all exactions of whatever character (*within the jurisdiction of the Secretary of the Treasury*)," etc.

As any interested party has a legal right to a hearing before the Tariff Commission and to constructive notice, at least, of the time and purpose of such hearing, we held in several decisions, some of which are cited in Judge Parker's opinion, that, a proper appeal having been taken, the quoted provisions of section 514, supra, and similar provisions in section 514 of the Tariff Act of 1922 were the source of this court's power to require the Tariff Commission and the President to "conform their action to the mode prescribed by Congress." See Monongahela Bridge v. United States, 216 U.S. 177, 195, 30 S.Ct. 356, 361, 54 L.Ed. 435. If, however, in making findings of fact and issuing proclamations under the provisions of section 336, supra, the President acts as a mere agent of the Congress in effectuating a legislative policy relating to an exclusively legislative function, as held in the case of Hampton & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624, the Congress certainly did not have in mind in enacting the provisions of section 514, supra, that a protest against the decision of the collector should confer jurisdiction upon the Customs Court and, on appeal, this court to review the evidence before the President for the purpose of determining whether there was any substantial evidence to warrant the raising or lowering of rates of duty. United States v. Klingenberg, 153 U.S. 93, 14 S.Ct. 790, 38 L.Ed. 647; Monongahela Bridge v. United States, supra.

Considering the provisions of section 336, supra, and the purpose of their enactment, I am of opinion that the findings and the proclamations of the President are legislative in character, and, the prescribed forms of legislation having been regularly observed as they were in the instant case, are not subject to impeachment in any judicial proceeding, and that the proclaimed rate of duty here involved is "as conclusive as though fixed by the statute itself." United States v. Klingenberg, supra [153 U.S. 93, 14 S.Ct. 792].

For the reasons stated, I think the judgment should be affirmed and, there-

fore, concur in the conclusion reached by Judges Parker and Lenroot.

GARRETT, Presiding Judge (dissenting).

It is with some diffidence and, of course, with greatest respect that I express disagreement as to the result reached in this case. This disagreement runs both to the conclusion and to certain of the basic matters upon which that conclusion is predicated.

I shall content myself with a statement in somewhat general terms of the reasons which lead me to dissent, not entering at length into details.

I concur in the view expressed in the opinion by Judge PARKER that the United States Customs Court and this court, on appeal, have jurisdiction to determine whether the actions of the United States Tariff Commission were in conformity with the statute defining and limiting the Commission's authority.

In the final analysis the precise question here involved is that of the validity of the President's proclamation, not the validity of the Commission's procedure or report. There is no claim of irregularity in the procedure pursued by the Commission in making its investigation nor is the accuracy of the report of primary facts based upon that investigation challenged. The claim is that the report itself, upon its face, shows a state of facts negativing the existence of a domestic egg albumen drying industry during the years 1928, 1929, and 1930, constituting the period taken as representative by the Commission for the purpose of comparing the costs of production of domestic and foreign articles. In brief, it is claimed that no domestic article within the meaning of "article," as used in the tariff statutes, was being produced during that period, and that the report itself so shows. It is further urged that if we go behind the report and examine the evidence taken in the course of the investigation it will be found that such evidence supports the negative finding which the importer attributes to the report.

I have long entertained, and now entertain, very grave doubt as to the authority of the courts to examine, as the majority of my associates have, the evidence taken before the Commission in cases such as that here presented, and I incline to the view that the reasoning of the Supreme Court in the case of Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796, is adverse to such authority. I appreciate the fact that the issues presented in that case were different from the issue here, but much of the reasoning of the court there seems applicable here. Partly as a result of this feeling, and partly because it seemed to me unnecessary to go beyond the report itself to determine the issue, I have not given meticulous study to the record made up by the Tariff Commission. Of course, I accept without question the statements made by my associates as to the facts shown by that record, but so accepting them, and assuming for the purposes of this case that such facts properly may be considered, I agree with Judge Bland that they do not furnish any stronger basis than the report itself for the Executive proclamation. Upon the contrary, they support what I regard as being, in effect, a negative finding with respect to the existence, during the representative period, of a domestic industry producing dried egg albumen.

The strongest statement, indeed practically the only statement, to be found in the report as to the amount of dried egg albumen produced domestically during the representative period, is contained in a footnote in that part of the report where the Commission summarized its findings, which footnote reads: "In 1929 one company tray-dried about 100,000 pounds of liquid whites, *partly to salvage them*. In 1931 another company, by a modified spray method which eliminates the pressure nozzle, and by a painstaking heat control, asserts that it has developed a method which is adapted to mass production methods and labor costs in the United States." [Italics supplied.]

It will be noted that the statement relative to what was done in 1931 (which incidentally was not one of the years embraced in the representative period) does not include any actual production but merely indicates a possibility of production. The poundage (100,000 pounds) stated to have been dried in 1929 (the only year of the representative period in which the report shows any to have been produced) was the weight of the whites before drying. The weight after drying, as is stated in the opinion by Judge PARKER, was approximately 10,000 pounds. It seems from statements in the report

that the importations of dried egg albumen during the three years of the representative period were in excess of ten million pounds. So, the domestic production was only one-tenth of 1 per centum of the total amount consumed. The report is replete with statements indicating clearly that the productions of dried egg albumen during the representative period were merely experimental in character. This is confirmed by the statement in the opinion of Judge PARKER, based upon an independent examination of the testimony taken by the commission, saying, "It is true that there was very little evidence as to production of dried egg albumen, and most of this was as to production of an experimental character." I have no quarrel with the finding immediately following the above to the effect that the feasibility of production was established; also, I agree that production costs were ascertained, but those were the costs of the purely experimental productions. There was, as I view it, no other kind of production shown.

In the opinion by Judge PARKER it is assumed, without deciding, "that it was the intention of Congress that duties should be raised under the flexible provisions of the tariff act only in cases where a domestic industry was in existence which Congress desired to protect, and that it was not intended that the Commission should increase duties in an attempt to bring new industries into existence." For reasons succinctly stated by Judge BLAND in his dissenting opinion, I agree with him that the assumption as stated is correct, and I would definitely hold it to be a part of the law of the case, as I also would the further assumption stated in the opinion by Judge PARKER, "that sporadic or experimental production would not satisfy the test of an existing domestic industry."

Another view expressed in the opinion by Judge PARKER with which I am unable to agree is that in the determination of the issue before us the egg drying industry must be considered as a whole.

I do not understand from the report of the Commission that such view was taken by it. The investigation obviously covered separately the drying of whole eggs, the drying of yolks and the drying of albumen. Each of these products has a distinct place in the arts and for most purposes they cannot be used interchangeably, although for some uses frozen products can be substituted for dried products. Referring to albumen the report says: "Egg albumen (dried whites) is consumed in baking powders, in certain candies and marshmallows, and in prepared meringue or whipping powders. Neither frozen nor liquid whites can be used in baking powder, in the other prepared powders nor, apparently, in wholesale marshmallow manufacture. In the last few years there has been an extensive displacement of dried whites by the frozen in the manufacture of certain candies; i. e., packaged goods which move rapidly through retail channels. Many large pie bakers are also now using frozen whites in their meringues for soft pies. For 'white' cakes, frozen or liquid whites have entirely replaced dried whites."

It is clear from the report that the methods of drying the respective products differ both in the United States and China, the principal foreign competing company. A spray process is said to be practicable for whole eggs and yolks, but the report states: "In the United States there has been some experimental drying of albumen by the spray method, but agitation caused by the pressure in the nozzle and by the high temperature used (not less than 163° F.) coagulates the albumen and largely destroys its whipping property."

It is noted that the discrepancies in production costs reported by the Commission differed with respect to each article. Thus, the cost of producing dried whole eggs in China was found to be 47.2 cents per pound and in the United States 89.5 cents per pound; the cost or dried egg yolk 46.8 cents per pound in China and 80 cents per pound in the United States; the cost of dried egg albumen 47.8 cents per pound in China and 107.3 cents per pound in the United States. So, the excess of the domestic over the foreign costs were found to be: "Dried whole egg, 42.3 cents per pound; dried egg yolk, 33.2 cents per pound; and dried egg albumen, 59.5 cents per pound."

The majority opinion correctly states that "Effort was made to have Congress fix the duty on the dried egg products at a higher rate because necessary to the protection of the egg producing industry," but that "This was not done."

It is proper to say that this effort was made while the Congress, particularly the Senate, was considering the bill which became the Tariff Act of 1930.

From the very fact that the question was then presented and agitated without

effect in the Congress itself; it seems to me that the deduction fairly may be drawn that, for reasons satisfactory to itself, the Congress evidenced an intention not to attempt to make possible the creation of a dried egg albumen industry by the levying of the extremely high duties requisite. While the Congress fairly may be assumed to have desired to give the egg industries generally a degree of protection, it may, I think, also fairly be assumed that it was indisposed to levy a tax ultimately to be paid by the consumers of dried egg albumen in an amount (if the duty was to be really effective) which the Commission's report indicates would have been necessary.

I am aware of the fact that the deduction from the circumstances related, might be said also to apply to dried whole eggs and dried egg yolk, but, so far as the issues of this case are concerned, we have no occasion to inquire into that. We must assume, so far as this case is concerned, that drying whole eggs and egg yolks existed as domestic industries, and that those articles, as domestic articles, were entitled to have consideration under the flexible tariff system, but it seems to me that upon the facts developed by the Commission's investigation the nonexistence of a domestic albumen drying industry was established and hence that there was no valid basis for that part of the Executive proclamation relating to that product. The fact that the procedure was had under a Senate resolution does not, in my opinion, affect the legal situation.

BLAND, Associate Judge (dissenting in part).

I am in full and hearty accord with the opinion by Judge PARKER (which will be referred to hereinafter as the leading opinion) on the first question decided. This is the main and, as I see it, the important question to decide in this case since it is a matter of general importance rather than specific to the facts at bar.

I agree fully for reasons stated in the opinion that, under the circumstances at bar, this court may examine the record made before the Tariff Commission, which discloses that no confidential information was submitted, for the purpose of ascertaining if the record does not show, without any substantial evidence to the contrary, that there was no such domestically produced *article* as the statute requires.

While the reasoning and citation of authority in the leading opinion are ample to support the conclusion reached on the right of this court to consult, for said purposes, the record made before the Tariff Commission, it is also proper, I think, to call attention to the fact that there is a close analogy between the situation at bar and that presented to the Circuit Courts of Appeal prior to the creation of this court, and presented to this court after it acquired jurisdiction formerly possessed by the Circuit Courts of Appeal. The decisions of the Circuit Courts of Appeal, such as Hermann et al. v. United States, C.C., 84 F. 151, as well as the decisions of this court, are uniformly to the effect that in a protest case which attacks the validity of the appraisement which determines the amount of duty, it was proper for the appellate court to review the appraisement proceeding records with a view of determining whether the appraisement upon which the liquidation was made was valid. Maddaus v. United States, 3 Ct.Cust.App. 330, T.D. 32623, and Lewisohn Importing & Trading Co. v. United States, 5 Ct.Cust.App. 204, T.D. 34329.

I must dissent from the conclusion reached, and the reasoning in reaching the conclusion, in answering the second question which involved the determination as to whether or not the record before the Tariff Commission, which was submitted to the President, supported, without substantial evidence to the contrary, the validity of the proclamation.

As I read the opinion, it does not hold that the flexible tariff provision may or may not be called into operation for the purpose of establishing a new industry or to revive an old industry which had ceased to exist. In the opinion, as I interpret it, it is found unnecessary to make any holding on this subject. It is my view, which I hope to express briefly, that section 336 was never intended to be used for the purpose of establishing a new industry or reviving an old one, but that it was meant to provide a means of ascertaining the cost of production of a "domestic article" produced in an American industry, which production cost, when compared with the production cost of the foreign article, would afford a proper basis for arriving at a tariff duty for the purposes expressed in the act. Whenever Congress in the past has undertaken through customs revenues to afford special tariff protection for an

industry that could not otherwise exist, it used appropriate language to do so. Examples of the same might be referred to, such as the provisions for the protection of the dye industry in the Tariff Act of 1922, the Antidumping Act 1921, 42 Stat. 11, and the unfair competition provisions of the 1922 and 1930 tariff acts.

We must not lose sight of the fact that in passing section 336 Congress could not have had in mind any one particular industry, but that its application was directed to many industries. I do not regard it as an important consideration that Congress by the enactment of paragraph 713, § 1, which prescribes the tariff rate for egg products, evidenced a disposition to protect the egg industry, and this consideration should not influence a determination of what Congress meant by the term "domestic article" in section 336.

Now, being in agreement with the leading opinion that we may go to the record made before the Tariff Commission under the circumstances at bar, the issue is squarely presented: Does the record, which contains no conflicting testimony, and all of the facts submitted to the commission, support the conclusion that there was a domestically produced *article* which would warrant the President in issuing the proclamation. I have carefully considered not only the evidence emphasized by the commission in its report to the President, and that which is pointed out in the leading opinion, but I have considered every other phase of the testimony and I am unable to arrive at a conclusion that during the representative period, or at any time thereafter, there was such an American industry producing such a domestic article as Congress had in contemplation when section 336 was enacted. I find no substantial evidence in the record from which the commission or the President might properly conclude that there was such an article produced. *It seems to me that the leading opinion suggests, if it does not definitely hold, that such an industry could not possibly have existed in the face of such devastating competition.*

The provisions of section 336 were intended to apply to an established American industry producing an article, the cost of production of which might be fairly compared with the cost of production of the foreign article. If the domestic production was sporadic and inconsequential to the extent that the production costs were so unnecessarily high as not to be fairly comparable with production costs abroad, no remedy, in my judgment, is afforded by the provision. We are here concerned with the evidence relating to the production of dried egg albumen. Testimony which might tend to establish that at some time or other there were industries producing other dried egg products might properly be used as an aid in determining the cost of production of dried egg albumen, since the production of all the dried egg products is obviously at times closely interlinked. It is my view, however, that if there was no dried egg albumen produced except sporadically, experimentally or as a salvage proposition, it would make little, if any, difference if other dried egg products were produced.

But, taking a broader view of the whole picture presented by the record, it seems to me that the record discloses, by evidence in which there is no conflict, that there was at no time, during the controverted period or thereafter, any industry in the United States which produced any dried egg products from which it might be fairly ascertained what the actual cost of production of dried egg albumen was. A few hundred pounds produced here, a few thousand pounds produced there, in spite of withering competition which was then known to exist, surely affords no basis for a conclusion other than that such production costs, if all proper elements were included, were so high as to afford no standard of comparison required by the statute. If, on the other hand, an isolated instance of the production of dried egg albumen is relied upon, and in that instance it is shown that the dried egg whites were obtained in a salvage operation from the production of other dried egg products, and not from a source which could be relied upon as a regular commercial proposition, it would seem to me to be obvious that such production was not that which the Congress contemplated. Under such circumstances, it seems obvious that all of the essential elements or items entering into production costs could not be ascertained with any degree of certainty and that any attempt to ascertain production costs under those conditions would necessarily bring forth an estimate based upon unreliable, theoretical premises rather than upon actual, existing facts.

Therefore, reviewing the record as a whole, it seems to me that all the evidence in the record supports the conclusion that during the critical period and thereafter there was no domestically produced article such as fills the requirement of the statute. Holding this view, I must respectfully dissent from the conclusion reached in affirming the decision of the trial court.